IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

MARK ANTHONY TEAS,

      Plaintiff,

v.                                                  Civil Action No. 5:12cv134

DETECTIVE MCCALLEN, et. al,

      Defendants.

**REPORT & RECOMMENDATION**

*I. INTRODUCTION*

On August 31, 2012, Plaintiff filed a civil rights complaint under 42 U.S.C. § 1983, alleging several constitutional violations surrounding a traffic stop and arrest that occurred in July of that year. The Court allowed Plaintiff to amend his complaint, which added to the original allegations, determined that summary dismissal was not appropriate, and ordered the Defendants to answer the complaint. The Defendants filed their answer and the Court entered a scheduling order. After some amount of discovery, Defendants filed a motion for summary judgment. In their motion, Defendants contend that the officers did not violate any clearly established constitutional rights, and thus are entitled to qualified immunity. On February 28, 2013, the Court sent Plaintiff a *Roseboro*[1] notice advising him of his right to file responsive materials. After an extension to respond was granted, Plaintiff timely filed his response. The motion is now ripe for this report and recommendation.

---

[1] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

## II. BACKGROUND

On July 8, 2012, a confidential informant (CI) contacted Officer Whitelatch to inform him that Plaintiff was making his way from Arkansas to Moundsville, West Virginia, with several bottles of prescription painkillers that he intended to sell. That same day, the CI again called Whitelatch to inform him that Plaintiff was staying in an area hotel, that he had been to the hotel room, and that he saw the prescription pills at the hotel room. Finally, the CI reported that Plaintiff was traveling in a maroon, four door car with Oklahoma plates, and that Plaintiff kept the pills with him.

Two days later, Whitelatch observed a maroon, four door car with Oklahoma plates driving in Moundsville. Officer Whitelatch followed the car, and, after observing the car make a right turn without a signal, initiated a traffic stop. Whitelatch approached the driver of the car, Eric Newberry, who advised him that he had a driver's license, but no insurance or registration on the car. During this colloquy, Officers Whitelatch and Murray saw Plaintiff, who was the lone passenger in the car, take a key off of his key ring and throw it under the seat. The two men were asked to exit the vehicle and written consent to search the car was given. The officers found the key that was thrown under the seat, but no drugs were found. During a *Terry*[2] frisk of Plaintiff performed immediately after officers ordered him out of the car, the officers did find over $1,000 in cash in Plaintiff's wallet.

After learning that Plaintiff was working on another vehicle at his mother's residence immediately preceding the traffic stop, Officer McCallen went to that home.[3] Plaintiff and the driver of the car remained on the roadside while Officer McCallen went to his mother's house, and although the officers told him he was not under arrest, he was not free to leave. Plaintiff's mother consented to a search of the residence, and to the green Mercury parked in the yard, stating that the

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

[3] Officer McCallen was assisted by Officer Sayman.

car was registered in both her's and her son's name. Nothing was found in the house, but Officer McCallen did find three pharmacy pill bottles of Oxycontin under the spare tire in the trunk of the Mercury. The officer then radioed back to Officers Whitelatch and Murray about the find, and Plaintiff was arrested. From the time Officer Whitelatch conducted the traffic stop to the time Plaintiff was arrested, approximately one hour passed.

Plaintiff's instant claims arise from this series of events. In his complaint, Plaintiff alleges that the officers harassed him, used excessive force, illegally searched and seized his property, violated his due process, and subjected him to cruel and unusual punishment. Specifically, his claim of harassment is that the car he was riding in was stopped solely to harass him, and that the officers told different stories in state proceedings as to the reason for the stop.[4] Further, the excessive force claim revolves around allegations that Detective McCallen squeezed Plaintiff's testicles and penis during the *Terry* frisk. Plaintiff further asserts that the officers did not have probable cause to stop and search him, his mother's house or the car there, and that the stop was excessively long. He further stated that this entire set of events violated his due process, and he was falsely imprisoned because of the illegal searches. Finally, Plaintiff claims that the alleged search of his genitals and having to remain on the side of the road for the hour during the investigation were cruel and unusual punishments. In his amended complaint Plaintiff adds to the allegations of cruel and unusual punishment by alleging that during an extradition transport to West Virginia he was forced to sit upright in a van for five days straight with no sleep or heat, and that he had to urinate and defecate

---

[4] Plaintiff asserts that in the criminal complaint the officers note a failure to use a turn signal, but in proceedings in state magistrate court one officer testified that the stop was for failure to signal and another officer testified that Plaintiff was being watched.

3

on himself because he was not allowed to use the restroom.[5]

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. *Id.*

"The burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Anderson*, 477 U.S. at 247-48. "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. Although the court views all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some concrete evidence from which a reasonable juror could return a verdict their favor. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 252.

---

[5] Plaintiff does not state in the complaint whether the officers are being sued in their official or individual capacity. However, given the deference afforded to *pro se* complaints, the Court will construe the complaint as one suing officers in their individual capacities to survive absolute immunity under the Eleventh Amendment to the United States Consitution. *See Haines v. Kerner*, 404 U.S. 519, 521 (1972) (discussing liberal construction of *pro se* pleadings, especially in civil rights cases); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir.1978) (same); *Williams-El v. Dunning*, 816 F. Supp. 418, 421 (E.D. Va. 1993) (allowing a pro se plaintiff to correct a pleading technicality by allowing *pro se* plaintiff to amend the complaint to clarify that officers were sued in individual capacities).

## IV. DISCUSSION

At the outset, the Court will first address Plaintiff's two Eighth Amendment claims: (1) during the *Terry* frisk and having to wait on the side of the road for an hour in the hot July sun; and (2) during an extradition transport for charges in Moundsville, West Virginia. "Eighth Amendment scrutiny is appropriate only after the state has secured a formal adjudication of guilty." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, the first claim must fail and should be dismissed. With regard to the second claim, Plaintiff has not named any of these Defendants as parties to that extradition transport, only that some company in Kentucky was responsible. Thus, even if the transport were after conviction, Plaintiff has failed to state a claim against any of these Defendants and that claim must be dismissed. The Court will then turn to the Fourth Amendment allegations.

### A. The Property Searches And Arrest

Plaintiff argues that the traffic stop initiated by the officers; the subsequent searches performed on his car at the stop, his mother's house, and the car at his mother's house; and the length of detention at the roadside while this series of events unfolded all violated his rights under the Fourth Amendment to the United States Constitution, and the Fourteenth Amendment's guarantee to due process. Further, he claims that this course of events was done solely to harass him. Plaintiff does not point the Court to, nor does the Court know of, any constitutional right that specifically addresses Plaintiff's claim of harassment. Thus, the Court will treat the claim as one, in the context of this case, as the right to be free from unreasonable search and seizure. The Court will discuss the remaining contentions in turn.[6]

---

[6] "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor,

*1. Probable Cause for the Traffic Stop*

In the criminal complaint associated with Plaintiff's arrest on that July day for possession with intent to deliver a controlled substance, Officer Whitelatch stated that he pulled Plaintiff over for making a right turn without using a turn signal, which disrupted his travel and the cars behind him. Plaintiff, on the other hand, tells the Court that the officers testified during a pretrial hearing in state magistrate court that they were watching him based upon the information obtained from the CI; thus, he claims the stop was pretextual. Neither party provided the transcripts of these state court proceedings. However, in any event, Defendants are entitled to summary judgment on the traffic stop because it was based upon probable cause.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. There is no question that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). In other words, "'[w]hen an officer observes a traffic offense–however minor–he has probable cause to stop the driver of the vehicle.'" *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir.1993) (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir.1990)). Here, the officers stated in their report that they initiated the traffic stop because Plaintiff failed to use a turn signal, a violation of W. VA. CODE § 17C-8-8(a), which states that "[n]o person shall so turn any vehicle without giving an appropriate signal," by "means of the hand and arm or by a signal lamp or lamps or mechanical signal device." W. VA. CODE § 17C-8-9. However, under West

---

490 U.S. 386, 395 (1989)). Here, the Fourth Amendment to the United States Constitution explicitly provides for the rights Plaintiff has claimed the officers violated, including the right to unreasonable search and seizure and excessive force. *See generally*, *Graham*, 490 U.S. at 395. Thus, the Court will not discuss these rights in relation to substantive due process.

6

Virginia law, failure to signal alone is not sufficient to warrant a traffic stop; rather, traffic must also be affected by the movement of the motorist's vehicle. *See Clower v. West Virginia Dept. of Mtr. Veh.*, 678 S.E. 2d 41 (W. Va. 2009). But, as mentioned, the officers detailed in their criminal complaint that traffic was affected by the failure to signal. Thus, the officers clearly had probable cause to stop Plaintiff's vehicle.

Further, even if the officers were watching for Plaintiff based upon a tip from a CI there is no constitutional infirmity. The Fourth Circuit employs an objective test for assessing whether a vehicle stop for a minor traffic violation is pretextual. *See United States v. Kellam*, 568 F.3d 125, 136 (4th Cir. 2009). "Under this test, 'if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity.'" *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)). Thus, even if the officers were watching for Plaintiff, and even following him based upon the information provided by the CI, so long as they had probable cause to stop the vehicle there is no intrusion upon the Fourth Amendment. As outlined, the officers clearly had probable cause to stop Plaintiff's vehicle based upon the violation of West Virginia's traffic laws.

*2. The Search of the Car and Length of Detention*

Plaintiff argues that the search of his vehicle and subsequent detention while officers conducted their investigation are unlawful. Plaintiff and Defendants give two different accounts of how long Plaintiff was detained roadside while the initial search of his car and person was performed, as well as the subsequent searches at his mother's house. Plaintiff avers that it was well over an hour, and took so long that one of the officers allowed the driver of the car to go into a local restaurant to get them all something to drink. Defendants contend the stop lasted no longer than forty

minutes. A dispatch form provided to the Court shows that from the time of the stop to Plaintiff's transport to the station, approximately one hour elapsed.

"Although law enforcement officers may stop a vehicle that they observe is violating a traffic law—a stop that amounts to a seizure for purposes of the Fourth Amendment—the officers may not detain the vehicle for longer than necessary to accomplish the purposes of the stop." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (citing *Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005). Of the tasks incident to successfully complete a traffic stop are asking for appropriate licenses and paperwork, verifying the information in the computer database, and issuing a citation. *United States v. Soriano–Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007). Officers may, for personal safety, order the occupants of the vehicle to get out until the stop is completed. *Id*. "Of course, if the officer has probable cause to believe that a search of the vehicle would uncover contraband, he may search the vehicle." *Ortiz*, 669 F.3d at 444.

"If an officer extends the detention beyond the scope of a routine traffic stop, he or she must possess either the person's consent or a 'reasonable suspicion' that illegal activity is afoot." *United States v. Roach*, 477 Fed. App'x. 993, 1000 (4th Cir. 2012) (quoting *Branch*, 537 F.3d at 336). In order to demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" that demonstrate at least "a minimal level of objective justification" for the belief that criminal activity is afoot. *Branch*, 537 F.3d at 337 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir.2008). "Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." *Id*.

"A suspect's consent to search provides an exception to the Fourth Amendment's warrant

and probable cause requirements," and [o]nce a [suspect] voluntarily gives consent, a search that falls within the scope of that consent is constitutionally permissible. *Id*. at 445. "Moreover, any consent given is valid until it is withdrawn by the defendant." *Id*. Here, police obtained written consent to search the vehicle. However, Plaintiff contends that one of the officers told him they could make them stay there for hours while they obtained a warrant. Of course, consent is only valid if it is given voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In measuring whether consent is voluntary, courts employ a totality of the circumstances test, *id*., and several factors, no single one being determinative, are relevant to this inquiry. Included among those factors are:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*U.S. v. Portillo-Aguirre*, 311 F.3d 647, 658-59 (5th Cir. 2002).

Initially, consent was sought from the driver of the vehicle, Eric Newberry. However, Mr. Newberry advised the officers that it was Plaintiff's car and that he would have to consent. Accordingly, the officers asked Plaintiff to exit the car, conducted a *Terry* frisk, and asked for consent to search the vehicle. This consent was given shortly after officers executed the traffic stop, Plaintiff was not handcuffed, and aside from the allegations by Plaintiff of excessive force in the frisk, there is nothing to show that the officers were acting in a coercive manner. Further, Plaintiff cooperated with the officers, and likely knew of his right to refuse consent–he claims that he was advising the officers of legal rules associated with traffic stops, including one he claims to be the "fifteen minute rule." The Court has no evidence of Plaintiff's education or intelligence. Finally, Plaintiff knew there was no incriminating evidence in that vehicle, which he stated to the officers

9

while they were searching, because he knew the prescription pills were in the car at his mother's house. To show that he knew this, Defendants provided the Court with a plea agreement, wherein Plaintiff pled guilty in a separate federal indictment to burglary of a pharmacy and admitted to stealing the pills found at his mother's residence from a pharmacy in Fort Smith, Arkansas. In looking at the totality of the circumstances, the Court finds the consent was freely and voluntarily given. It then follows that the search of his vehicle was constitutional.[7]

Likewise, the length of detention while officers investigated their drug activity hunch was not repugnant to any constitutional protections. As outlined, an investigative detention is proper

> if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity. Reasonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with probabilities. It requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence. Because reasonable suspicion is a less demanding standard than probable cause, it can arise from information that is less reliable.

*United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011); *see also Branch*, 537 F.3d at 337. In Bullock, the Seventh Circuit held that the investigative detention of a suspected drug dealer was proper when officers executed a traffic stop based on a road violation, detained the suspect, and went back to his house to execute a warrant on that house.

Almost identical to *Bullock*, the officers here had information from a CI that Plaintiff was traveling to Moundsville, West Virginia, with a large amount of oxycontin that he intended to sell. Further, the CI stated that Plaintiff was traveling in a maroon, four door car with Oklahoma plates,

---

[7] Further, any insinuation that Plaintiff did not have authority to consent because it was not his car is dispelled because the police reasonably believed based upon the driver's statements that it was Plaintiff's car. *See Illinois v. Rodriguez*, 497 U.S. 177 (1990). Even absent the consent, based upon the information provided by the CI, and the suspicious activities of Plaintiff after the stop, the officers still had probable cause to execute a warrantless search of the vehicle. *See* United States v. Ross, 456 U.S. 798 (1982).

and that the CI saw the pills in a motel room that Plaintiff rented. Thus, when officers pulled over a vehicle matching this description exactly, and learned that Plaintiff was in the car, they had a reasonable probability to believe that illegal activity was afoot.[8] Further, after approaching the car, officers noticed Plaintiff take a key off of his keyring, later identified as a motel room key, and throw it under the passenger seat. This suspicious activity gave the officers further facts to add to the belief that they already had that Plaintiff was involved in drug activity, which provided the reasonable suspicion needed to detain him during their investigation.

A detention based upon reasonable suspicion can turn in to a de facto arrest that must be based upon probable cause if the detention continues too long or becomes unreasonably intrusive. *Bullock*, 632 F.3d at 1015. In determining whether a detention continues too long or becomes unreasonably intrusive, courts "consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." *Id*. (citing *United States v. Sharpe*, 470 U.S. 675, 685–687 (1985)). Certainly there were important law enforcement purposes to be served because they had reason to believe that Plaintiff arrived in the area with enough prescription pills to net $70,000 to $80,000. Further, considering the circumstances of the searches, one hour is a reasonable amount of time. Finally, police diligently pursued the investigation. After the search of Plaintiff's car did not reveal the drugs they were looking for, officers asked where Plaintiff came from. He replied that he was doing some work for his mother at her house, which was only short distance from where the traffic stop occurred. Two of the officers then immediately went to that home, received consent to search, found the drugs, and radioed back to the officers waiting roadside to take Plaintiff into custody. Thus, the

---

[8] One of the officers was also familiar with Plaintiff from a previous run in he had with the Moundsville Police Department.

investigative detention was reasonable.

*3. The Subsequent Searches*

Plaintiff also believes his constitutional rights were violated when two of the officers traveled to his mother's residence, located nearby to where the traffic stop was executed, and searched her home and the vehicle in the driveway. After effectuating the traffic stop, and confirming that Plaintiff was in fact in the vehicle, the officers began investigating their suspicions, based on the information provided by the CI, that Plaintiff was engaged in illegal drug activity. This investigation led them to Plaintiff's mother's house. Upon arriving at the house, the officers received consent to search her home, and the vehicle in the yard. As detailed above, valid consent to search is an exception to the Fourth Amendment.

Further, it was constitutionally permissible for the mother to consent to the search of the vehicle even though Plaintiff was a joint registrant of that vehicle. It is clear that justification of a warrantless search by proof of voluntary consent "is not limited to proof that consent was given by the [suspect]," and it may be shown that "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority is not to be implied "from the mere property interest a third party has in the property, . . . but rests on mutual use of the property by persons generally having joint access or control for most purposes." *Id*. at 171 n.7. Here, the mother was on the registration of the car, thus there was clearly joint access to the use and control of that vehicle. And, although Plaintiff's presence and objection to the search might have presented another scenario, *see Georgia v. Randolph*, 547 U.S. 103 (2006), because Plaintiff was not present at the time the consent was given he "loses out" on the opportunity to object. *Id*. at 121. Thus, the search that revealed the prescription pills, which ultimately led to the probable cause for

Plaintiff's arrest, was valid.⁹

*4. The Arrest and Claim of False Imprisonment*

The culmination of these events which Plaintiff contends were unconstitutional was the warrantless arrest of Plaintiff. Whether a warrantless arrest is permissible under the Fourth Amendment turns on whether the officers had probable cause to believe that a suspect has committed a felony. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (holding that information provided by a CI was sufficient to establish probable cause to make a warrantless arrest). The constitutional sequence of consented to searches that led to the discovery of the narcotics, in conjunction with the corroborated information provided by the CI, surely gave the officers probable cause to believe that Plaintiff had committed the felony of distribution of a controlled substance. It then follows that Plaintiffs claim of false imprisonment must too fail.

**B. The Personal Search**

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may perform a patdown of a suspect's outer clothes "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Defendant McCallen, who performed the *Terry* frisk, claims in his motion for summary judgment that he performed the search because he believed that Plaintiff possessed Oxycontin.

The Fourth Circuit has become troubled as of late with officers "cobbling together a set of

---

⁹ The Court will again note that Plaintiff pled guilty to burglarizing a pharmacy to steal the pills that were found in that car.

facts that falls far short of establishing reasonable suspicion" to stop or frisk a citizen under *Terry*. *See United States v. Foster*, 634 F.3d 243 (4th Cir. 2011); *United States v. Massenburg*, 654 F.3d 480, 482 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011); *United States v. Powell*, 666 F.3d 180 (4th Cir. 2011). For the reasons thus discussed, the officers clearly had reasonable suspicion that criminal activity was afoot to warrant an investigative stop under *Terry*. However, in order to then place their hands on a citizen without a warrant—a *Terry* frisk—the officers would have to state with articulable facts that they had a reasonable suspicion that Plaintiff was *armed and dangerous*.

An officer does not have to be absolutely certain that a suspect is armed; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Powell*, 666 F.3d at 186 (citing *Terry*, 392 U.S. at 27). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and it is measured by the totality of the circumstances, *United States v. Arvizu*, 534 U.S. 266, 273 (2002)." *Id*. It is an objective test, which looks to the facts known by the officers prior to the search. *Id*.

As a point of comparison, in *Powell* the Fourth Circuit was faced with a similar case. Officers there made a routine traffic stop for a burned out headlamp. *Id*. at 184. After running the license of the driver, which came back as suspended, the officers asked the other two passengers for their licenses to ascertain whether one of them could drive the car away after the completion of the stop. *Id*. After running those licenses, the officers learned that one of the passengers was a convicted felon for some prior armed robberies. *Id*. Based upon this revelation the officers asked the passengers to get out of the car, which the Court found was permissible, and then proceeded to conduct a *Terry* frisk and found a weapon on the passenger with the criminal record. *Id*. The Court

found that this ran afoul of *Terry* and constituted an unreasonable search. *Id*. at 189.

In the instant case, the only reason given by Officer McCallen is that he thought Plaintiff had narcotics on his person. There was no information from the CI that Plaintiff was carrying a firearm, or was otherwise armed and dangerous. Nor did the officer claim that the driver of the vehicle, or the Plaintiff, exhibit any hostile or elusive activity to the officers. In fact, from the record presented it appears that the entire stop and colloquy between the officers and suspects was quite mundane. Officers did not approach the vehicle guns drawn, nor did they have any reason to unholster their weapons after speaking to the occupants. Further, there was nothing offered by the officers that they knew Plaintiff carried arms, or that he was otherwise dangerous. Finally, Plaintiff was not under arrest at the time of the search of his person; thus, no search incident to arrest exception applies. Simply put, based on this clearly announced precedent by the United States Supreme Court in *Johnson*, and the Fourth Circuit in a line of cases in 2011, *supra*, the Court cannot say that the search was reasonable as a matter of law.

This does not end the inquiry, however, because officers may still be qualifiedly immune from the unconstitutional actions. To establish whether officers are entitled to qualified immunity, courts first ask whether the constitutional right that was violated was clearly established at the time of the violation, and second whether a reasonable officer would find the violation lawful. *See e.g. Pearson v. Callahan*, 555 U.S. 223 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800 (2001); *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992). The first inquiry presents a pure question of law, *Pritchett*, F.2d at 312, which this Court has already found was clearly established. The second part, however, involves application of an "objective test to the particular conduct at issue, [and] may require factual determinations respecting disputed aspects of that conduct." *Id*. In determining the reasonableness, the Court looks to the information available, or reasonably available, to the officer at the time of the

violation, and "any exigencies of time and circumstances that reasonably may have affected the officer's perceptions." *Id*.

The United States Supreme Court's decision in *Terry v. Ohio* is, to say the least, a landmark case in this country's jurisprudence. It established that, before an officer can lay his hands on a free citizen, he must have an articulable suspicion that the suspect is armed and dangerous. The Supreme Court's most recent decision on this right to be free from unreasonable searches, *Johnson*, *supra*, reiterated how the holding in *Terry* has not wavered, discussing cases between then and now, and that an officer *must* show that he felt a suspect was armed and dangerous, specifically applying the holding to passengers during an automobile stop. The decision in *Johnson* is not a new one, coming down in 2009, and adds nothing new to *Terry*, which has been the law of the land for four decades now. Thus, it is clearly established that an officer needs a suspicion, grounded in articulable facts, to place his hands on a free citizen. Further, every reasonable officer must know the contours of this right, as it is one that an officer applies regularly. Finally, nothing in the record provided to the Court shows that the officers were threatened, under a time constraint, or other exigencies existed which would threaten the officer's perceptions on that July afternoon. Accordingly, the Court finds that Officer McCallen is not entitled to summary judgment on the unconstitutional *Terry* frisk he performed on Plaintiff because there remains a genuine issue of material fact as to whether Officer McCallen had an objective basis for conducting the search.

Similarly, he is not entitled to summary judgment on the claim of excessive force. Plaintiff alleges in his sworn complaint that Officer McCallen, during the *Terry* frisk, reached into his underwear and searched under his testicles. Further, Plaintiff claims that when he objected to these actions, McCallen squeezed his testicles and penis. A claim of excessive force during an investigatory stop is analyzed under the objective reasonableness standard applied under the Fourth

<em>16</em>

Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Determining whether the force used is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id*. at 396. Further, it has long been "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." No factor can tip the scales in the officer's favor in this case. There is no government interest in searching under the scrotum of a person not under arrest on the side of the road. There was no resistance by Plaintiff, and there was certainly no dangerous arms lurking under Plaintiff's scrotum. The only issue in this case is that it is Plaintiff's word against the officer's, who vehemently denies performing the search in this manner.

"[O]n summary judgment, 'the non-moving party is entitled to have his evidence as forecast assumed, his version of that in dispute accepted, and the benefit of all favorable inferences.'" *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 275 (4th Cir.1995) (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 233 (4th Cir.1991)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court is faced with just that: a he said, he said scenario that standing alone might not convince a jury. Here, however, there is more, and the Court cannot say that "no reasonable jury" could believe Plaintiff's allegations. This case has proceeded into some discovery. As part of that discovery, Plaintiff posed the following requests for admission on each of the other officers on the scene: "You witnessed McCallen do the Terry frisk?" Each of the officers denied witnessing the frisk. However, in their affidavits in support of the motion for summary judgment, the officers stated: "I did not observe anything improper about

17

the manner in which Det. McCallen searched Mr. Teas and deny observing Det. McCallen's searching Mr. Teas in the manner in which he describes in his Complaint. . . ." This creates more than just a factual dispute between Plaintiff and Officer McCallen as to whether the alleged search occurred, and shows some inconsistency between witness statements; an issue at the heart of the function of a jury: determining witness credibililty. Further, Plaintiff has sought, and obtained the Court's permission, to depose by written questions the driver of the car that day, Eric Newberry, who Plaintiff claims witnessed the incident. Accordingly, summary judgment cannot be granted on the excessive force claim as to Officer McCallen.

## V. CONCLUSION & RECOMMENDATION

For the foregoing reasons, the Court recommends that summary judgment be **GRANTED** on all counts for Defendants Whitelatch, Murry, and Saymen. Further, that summary judgment be **GRANTED IN PART AND DENIED IN PART** for Defendant McCallen. Because Defendant McCallen violated a clearly established law, but there exists a genuine issue of material fact as to whether Officer McCallen had an objective basis for the violation, the Fourth Amendment claim regarding the *Terry* frisk should survive summary judgment. Similarly, because there are genuine issues of material fact with regard to the claim of excessive force, that claim, too, should survive summary judgment.

The Clerk is directed to transmit a copy of this order to the *pro se* Plaintiff via certified mail, return receipt requested, and any other counsel of record, as applicable. Any party may, within fourteen [14] days of receipt of this recommendation, file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge of record. Failure to timely file objections to this recommendation will result in waiver of the right to

appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

DATED: May 1, 2013 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE